IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

PASS & SEYMOUR, INC.,

                          Plaintiff,

                                              Civ. Action No.
                                              5:07-CV-0272 (NAM/DEP)

        vs.

HUBBELL INCORPORATED,

                          Defendant.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFFS:

BOND, SCHOENECK LAW FIRM              GEORGE R. McGUIRE, ESQ.
One Lincoln Center                    DAVID L. NOCILLY, ESQ.
Syracuse, New York 13202

FOR DEFENDANT:

ROYLANCE ABRAMS LAW FIRM              MARK S. BICKS, ESQ.
1300 19th St., N.W.
Suite 600
Washington, D.C.  20036-1649

COSTELLO COONEY LAW FIRM              EDWARD G. MELVIN, ESQ.
205 South Salina St., 4th Floor
Syracuse, New York 13202

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Pass & Seymour, Inc. ("P&S"), a manufacturer and distributor of electrical wiring products headquartered in Syracuse, New York, has commenced this action asserting patent infringement claims against defendant Hubbell Incorporated ("Hubbell"), a Connecticut–based competitor.  In its complaint, P&S alleges that Hubbell's quick-connect product, designed to enhance efficiency in the installation of wiring devices such as electrical sockets and switches, is a "knock-off" of plaintiff's hugely successful PLUG-TAIL product and infringes the underlying patents under which PLUG-TAIL is manufactured and sold.

In furtherance of its efforts to sideline one of only a handful of potential direct competitors in what is described as a "niche market", P&S has moved for a preliminary injunction precluding Hubbell from marketing its accused product during the pendency of this action.  Hubbell has since countered with an application for a stay of the case based upon its application to the United States Patent and Trademark Office ("PTO") for reexamination of the patent now in suit.

Having carefully reviewed the parties' submissions and considered the evidence and testimony adduced during a hearing conducted to address the pending cross-motions, which have been referred to me for the issuance of a report, I recommend against granting the requested

2

preliminary injunction, finding that legitimate questions have been raised

regarding the validity of plaintiff's patent, and thus the likelihood that P&S

will prevail at trial, and that consideration of the other relevant factors

which inform the preliminary injunction analysis including, *inter alia*,

whether plaintiff will suffer irreparable harm in the absence of an

injunction, militates against the award of such relief.  Additionally, because

the results of a reexamination of plaintiff's patent could allow the court and

the parties to benefit from the PTO's expertise in addressing the validity of

the patent in suit and potentially avoid considerable litigation expense, I

recommend that this action be stayed until such time as the

reconsideration process is concluded or the PTO declines to entertain

Hubbell's request.

I.      BACKGROUND

        Plaintiff P&S, a New York corporation with its principal place of

business located in Syracuse, New York, is a well-known manufacturer

and distributor of electrical wiring products throughout the United States.

Among the products offered by P&S is a newly developed device sold

under the brand name PLUG-TAIL.  The PLUG-TAIL, which represents an

embodiment of multiple patents held by P&S, including U.S. Patent No.

7,189,110 (the "'110 patent") issued by the PTO on March 13, 2007, is a

device designed to improve the speed and ease with which electrical

devices such as electrical sockets and switches are installed, particularly during the construction process.  In one particular iteration of the PLUG-TAIL, stripped ends of the three insulated wires typically included within a bundled electrical power source cable are electrically coupled, through the use of a wire nut or electrical tape, to correspondingly colored cables forming part of a plug connector.[1]  In some models of the PLUG-TAIL device these electrical transmission wires may be fed directly into the housing of the plug connector and affixed through crimping or some other similar means.  The housing portion of the plug connector into which the wires are fed is then plugged into a receptacle on the rear surface of the particular electrical wiring device, thus completing the circuit.  PLUG-TAIL devices are particularly well-suited for installation in health care facilities, educational institutions, retail establishments, hospitality locations, and multiple dwelling housing units.[2]

P&S markets and promotes its PLUG-TAIL device as a means of reducing the time required to install electrical devices and permitting installation by less-experienced electricians, thereby significantly reducing

---

[1]     A typical conventional electrical bundled power cable contains a neutral wire, generally white in color; a ground wire, which is normally colored green; and a "hot" wire, which is ordinarily black.

[2]     Quick-connect devices are not generally favored for installation into single family residential dwellings in light of the significantly higher cost associated with them, as compared to the expense of acquiring traditional electrical receptacles.

labor costs associated with those installations.  P&S thus touts the benefits of utilizing the PLUG-TAIL system over a conventional plug or switch, the installation of which typically requires that a stripped end of each of the three source wires be individually connected to the device by wrapping it around a screw on the apparatus and tightening that screw.

Bringing the PLUG-TAIL, which is representative of a quick-connect device introduced by P&S in or about June of 2004 to what was then a relatively young market, to a point of commercial viability entailed significant investment by P&S in terms of both research and development, and advertising.  The results of that investment have proven to be extremely favorable; sales of the P&S PLUG-TAIL devices have increased from $503,182 for the portion of 2004 during which the product was available, to a pinnacle of $2,084,633 in 2006, with the expectation, based upon year-to-date sales, that that figure will double in 2007.

P&S introduced its PLUG-TAIL, the first commercially-available quick-connect device, under U.S. Patent No. 6,994,585 (the "'585 Patent") issued on February 7, 2006, and addressing certain aspects of the PLUG-TAIL device design.  The '110 patent was issued as a "continuation–in–part" of the application leading to the issuance of '585 patent, and was followed by the issuance on March 27, 2007 of U.S. Patent No. 7,195,517 (the "'517 Patent") as a "continuation" of the

5

application which led to the issuance of the '110 patent.[3]

The '110 patent, one of the two patents implicated in the pending motion for preliminary injunction, contains a total of forty-six claims, comprised of four of which are independent (claims one, twenty-one, twenty-five, and thirty-five) with the balance being dependent. Although plaintiff's complaint is not so specific or necessarily limited, in its motion for preliminary injunction plaintiff places reliance solely upon claims 25 and 29 of the '110 patent. The first of those claims specifies

> [a]n electrical wiring system comprising:
>
> a plug connector including a plurality of plug contacts, the plug connector being configured to terminate a plurality of wires; and
>
> an electrical wiring device including a cover member, a body member having a back major surface, and a ground strap disposed between the cover member and the body member, the body member including a receptacle configured to accept the plug connector and a plurality of device contacts, the plurality of device contacts being configured to mate with the plurality of plug contacts when the plug connector is inserted into the receptacle, a distance from the ground strap to

---

[3]        A "continuation-in-part" designation signifies that an application repeats "some substantial portion or all" of the subject included within an earlier patent. Manual of Patent Examining Procedure § 201.08; *see also Go Med. Indus. Pty., Ltd. v. Inmed Corp.*, 471 F.2d 1264, 1270 (Fed. Cir. 2006). The term "continuation" means that the application is "for the same invention claimed" in that earlier patent. Manual of Patent Examining Procedure § 201.07; *see also Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1363 (Fed. Cir. 2007); *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1337 (Fed. Cir. 2006).

the back major surface is less than 2.5 inches. Claim 29 adds the limitation that the distance between "a major plug surface to the back major surface is approximately 0.5 inches or less," to enhance compactness of the device and to allow for additional space for the housing of wires within the box into which it is installed.

Plaintiff's quick-connect patents, dating back to the '585 patent, have not been without controversy. On November 29, 2006, Hubbell sought reexamination of the '585 patent by the PTO. That request was granted, and resulted in a PTO office action, mailed on March 26, 2007, rejecting the claims of the '585 patent as unpatentable under 35 U.S.C. § 102 and/or § 103 in light of prior art. P&S has since filed a response with the PTO substantially amending the scope of the '585 claims.

On April 11, 2007 Hubbell sought reexamination of the '110 patent by the PTO. A similar request for reexamination, challenging the more recent '517 patent, was filed by Hubbell on May 8, 2007. The PTO has yet to respond to those requests, although under the agency's rules of practice those responses are not due until July 11, 2007 and August 8, 2007, respectively.

This action was precipitated by defendant Hubbell's announcement that it will soon be offering quick-connect products to compete with the P&S PLUG-TAIL line. In connection with that initiative, Hubbell has begun

offering a Bryant brand device marketed as including a SNAP CONNECT feature, with many similarities to the P&S PLUG-TAIL quick-connect device.

In its submissions, Hubbell does not seriously dispute that its SNAP CONNECT product infringes claims twenty-five and twenty-nine of the '110 patent.[4]  Rather, defendant's opposition to the preliminary injunction motion centers upon its contention that the '110 patent is invalid over the prior art, and impermissibly vague.  The prior art chiefly relied upon by Hubbell in making that argument is U.S. Patent No. 4,842,551, issued on June 27, 1989 to Anthony J. Heimann (the "Heimann patent") for a "modular connector assembly . . . for . . . an electrical utility box."  The focus of the Heimann patent is a wire harness or cable sheath fed into an electrical box, with a clamping mechanism to hold the wires in place. According to drawings reflecting one particular embodiment, at the end of the sheath are multiple plug connectors designed to fit into, and be held frictionally by, receptacles in the socket or other device into which it is to be wired.

---

[4]     Lending credence to plaintiff's claim that defendant's product is a "knock-off" of the P&S PLUG-TAIL, Hubbell has promulgated a "competitive profile analysis" in connection with its new quick-connect product which not only reveals striking similarities of Hubbell products to P&S devices, including plaintiff's "PT 5362", but in fact reflects that its counterpart product to that model has been designated similarly as the "SNAP5362".

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on March 13, 2007, asserting a claim of infringement against Hubbell under the '110 patent.  Dkt. No. 1. An amended complaint was later filed on March 28, 2007, adding a second claim alleging infringement of the '517 patent.[5]  Dkt. No. 9.   Issue has been joined by the filing on April 10, 2007 of an answer to plaintiff's complaint, with inclusion of both affirmative defenses and counterclaims asserting, *inter alia*, invalidity of the '110 and '517 patents.  Dkt. No. 10.

On March 20, 2007 P&S moved for the issuance of a preliminary injunction prohibiting Hubbell from marketing its competing, accused quick-connect devices, pending final disposition of the action.  Dkt. No. 6. Defendant has since submitted papers in opposition to plaintiff's preliminary injunction motion and in support of a cross-motion for a stay of proceedings in the case, pending completion of the reexamination process by the PTO.  Dkt. Nos. 24-27.  Plaintiff's motion for a preliminary injunction has been referred to me for the issuance of a report and recommendation

---

[5]        This is the second action brought by P&S against Hubbell claiming infringement as a result of its marketing of quick-connect devices.  On January 5, 2007 P&S commenced suit against Hubbell alleging infringement of the '585 Patent.  See *Pass & Seymour, Inc. v. Hubbell Inc.,* No. 5:07-CV-0017 (NAM/DEP) (N.D.N.Y., filed 2007).  That action has been stayed indefinitely, on stipulation of the parties, based principally upon the ongoing PTO reexamination process associated with the '585 patent.  *See id.*, Dkt. No. 13.

to Chief Judge Norman A. Mordue.[6,7]  *See* Dkt. No. 18.

III.   DISCUSSION

A.   Plaintiff's Motion For A Preliminary Injunction

1.   Preliminary Injunction Standard

Rule 65 of the Federal Rules of Civil Procedure empowers a district court to enter a preliminary injunction.  The decision of whether to grant a preliminary injunction rests within the sound discretion of the trial court.  *See Jayaraj v. Scappini*, 66 F.3d 36, 38 (2d Cir. 1995).

---

[6]      In addition to the pending cross-motions, both parties have interposed motions *in limine*.  In its motion, P&S seeks exclusion of an affidavit of Joseph H. McGlynn, a patent attorney, submitted by the defendant in support of its position.  Dkt. No. 28.  Defendant has countered *in limine,* seeking exclusion from consideration on the motions of an exhibit attached to plaintiff's amended complaint, asserting unfairness associated with the fact that while the document was attached to plaintiff's amended complaint, and thus the document itself should come as no surprise, P&S did not make any arguments based upon that exhibit in connection with the pending cross-motions until submission of its reply, thus depriving Hubbell of a fair opportunity to respond.  Dkt. No. 31.

[7]      Defendant's motion for a stay of proceedings, pending litigation, would ordinarily fall within my non-consensual jurisdiction under 28 U.S.C. §§ 636(b).  *See Securities & Exchange Comm'n v. Kornman*, No. 04CV1803L, 2006 WL 148733, at *2 (N.D. Tex. Jan. 18. 2006) (expedited application for stay of proceedings considered nondispositive motion); *Livingston v. Metropolitan Life Ins. Co.*, No. 99CV0231R, 2000 WL 422242, at *4-5 (N.D. Tex. Mar. 6, 2000) (motion for stay appears to be nondispositive motion appropriately directed to magistrate judge).  Because defendant's stay motion is intertwined with and raises many of the same issues those implicated by plaintiff's request for a preliminary injunction, however, I have chosen to format my response to that motion as a recommendation to Chief Judge Mordue.  *See, e.g., Livingston*, 2000 WL 422242, at *4-5.  The pending cross-motions *in limine* seeking exclusion of certain materials, on the other hand, plainly fall within my jurisdiction and have been dealt with accordingly.  *See Gunter v. Ridgewood Energy Corp.*, 32 F. Supp. 2d 162, 164 (D.N.J. 1998) (stating that evidentiary rulings of a magistrate judge are nondispositive); *see also Anton v. SBC Global Servs., Inc.*, No. 01-40098, 01-40213, 2007 WL 1648929, at *1 (E.D. Mich. June 6, 2007); *Jesselson v. Outlet Assocs. of Williamsburg, Ltd. P'ship*, 784 F. Supp. 1223, 1228 (E.D. Va. 1991).

A patent holder claiming infringement properly may properly make an application to a court for the entry of a preliminary injunction.  *See* 35 U.S.C. § 283.  In a patent case, the preliminary injunction calculus requires the court to consider four factors, including "(1) the likelihood of the patentee's success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest."  *Oakley, Inc. v. Sunglass Hut Int'l,* 316 F.3d 1331, 1338-39 (Fed. Cir. 2003) (citing *Amazon.com, Inc. v. Barnesandnoble, Inc.,* 239 F.3d 1343, 1350 (Fed. Cir. 2001)).  "These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested."  *Hybritech Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1451 (Fed. Cir. 1988); *Amazon.com,* 239 F.3d at 1350 (quoting *Hybritech*).  A preliminary injunction in a patent case, however, "is an extraordinary remedy reserved for circumstances in which the merits of movant's case are clear, the irreparable injury is manifest, the hardships tip decidedly in the movant's favor and the public interest is served by the injunction."  *Canon Inc. v. GCC Int'l Ltd.*, 450 F. Supp. 2d 243, 246 (S.D.N.Y. 2006).

When assessing the likelihood of success on the merits a court must examine the issues of patent validity and infringement.  Analysis of the

likelihood of infringement requires a determination of the scope and meaning of the patent claims asserted, followed by comparison of the properly construed claims to the accused device. *Oakley*, 316 F.3d at 1339; *see also Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*). Judging the likelihood of an ultimate finding of validity of a particular patent claim in light of the prior art similarly entails a two-step process which includes both claim construction and a comparison of the construed claims with the prior art. *Oakley,* 316 F.3d at 1339. When an accused infringer has asserted anticipation, "[a] determination that a claim is invalid as being anticipated or lacking novelty under 35 U.S.C. § 102 requires a finding that 'each and every limitation is found either expressly or inherently in a single prior art reference.'" *See id.* (quoting *Celeritas Techs., Inc. v. Rockwell Int'l Corp.,* 150 F.3d 1354, 1360 (Fed. Cir. 1998)).

The law enshrouds a regularly issued patent with a presumption of validity. 35 U.S.C. § 282; *see Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). In light of this presumption, at trial an accused infringer attempting to establish invalidity is required to establish that defense by clear and convincing evidence. *Id.* This invalidity algorithm is altered significantly, however, in the preliminary injunction context. Despite the ultimate burden to be born by an accused infringer at trial, a party

12

seeking a preliminary injunction "retain[s] the burden of showing a reasonable likelihood that the attack on its patent's validity would fail." *H.H. Robinson Co. v. United Steel Deck,* 820 F.2d 384, 387 (Fed. Cir. 1987), *overruled on other grounds*, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995).  Accordingly, in order to defeat a preliminary injunction motion on the basis of invalidity, which factors into the likelihood of success element of the controlling test, an accused infringer must raise a substantial question concerning validity.  *See Gonzales v. O'Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 126 S. Ct. 1211, 1219-20 (2006); *see also Genetech, Inc. v. Novo Nordisk A/S,* 108 F.3d 1361, 1364 (Fed. Cir. 1997).

2.     Likelihood of Success on the Merits

Claim 25 of the '110 patent consists of claim terms which are largely uncontroversial.  That claim in essence specifies 1) an electrical wiring system, comprising 2) a plug connector with multiple contacts being configured to terminate multiple wires, and 3) an electrical wiring device including a cover member, a body member having a back major surface and ground strap disposed between the cover member and the body member, with 4) the body member including a receptacle configured to accept the plug connector and the multiple device contacts, with 5) the multiple device contacts being configured to meet with the multiple plug

contacts when the plug connector is inserted into the receptacle; and 6) containing a distance between a ground strap and the back major surface of less than two and one-half inches.  Claim twenty-nine adds the limitation that the distance between a major plug surface and the back major surface of the device, when the plug is connected into the device, is approximately one-half inches or less.

### a.   Infringement

There can be little doubt that plaintiff has made a strong showing of infringement – a matter which Hubbell does not vigorously contest.  The proposed Hubbell quick-connect device, and in particular the Hubbell Snap 5362 referenced in its marketing materials, appears to read on all of the limitations of claim twenty five, as so construed.[8]

### b.   Invalidity

The true battleground in this case, for purposes of likelihood of success on the merits, is found in the invalidity arena.  Hubbell asserts that claims twenty-five and twenty-nine of the '110 patent are invalid on a

---

[8]   Hubbell's non-infringement argument centers principally upon the indefiniteness which, it contends, surrounds claims 25 and 29 of the '110 patent. Hubbell argues that the claims do not require the receptacle to be in the back major surface of the body member, and fail to reveal what is regarded as the "major surface" for purposes of measuring distance to the back major surface of the device.  In light of my findings of serious questions surrounding defendant's claim of invalidity based on obviousness, and that P&S has failed to establish that it will suffer irreparable harm, absent the issuance of a preliminary injunction, I will not address this argument, which substantially overlaps with one aspect of Hubbell's invalidity defense.

variety of bases including, *inter alia,* for obviousness as well as based

upon indefiniteness and the failure to name John Benoit as the main

inventor.

> i.  <u>Inventorship</u>

The question of inventorship is easily dispelled.  Hubbell's argument

in this regard implicates 35 U.S.C. § 116 which provides, with respect to

joint inventors, that

> [w]hen an invention is made by two or more
> persons jointly, they shall apply for patent jointly
> and each make the required oath . . . . Inventors
> may apply for a patent jointly even though (1) they
> did not physically work together or at the same
> time, (2) each did not make the same type or
> amount of contribution, or (3) each did not make a
> contribution to the subject matter of every claim of
> the patent.

35 U.S.C. § 116.  Section 103(a), however, provides that "[p]atentability

shall not be negatived by the manner in which the invention was made."

35 U.S.C. § 103(a).  Instead, under 35 U.S.C. § 256,

> [w]henever through error a person is named in an
> issued patent as the inventor, or through error an
> inventor is not named in an issued patent and such
> error arose without any deceptive intention on his
> part, the Director may, on application of all the
> parties and assignees, with proof of the facts and
> such other requirements as may be imposed, issue
> a certificate correcting such error.
>
> The error of omitting inventors or naming persons
> who are not inventors shall not invalidate the

> patent in which such error occurred if it can be
> corrected as provided in this section.  The court
> before which such matter is called into question
> may order correction on the patent on notice and
> hearing of all parties concerned and the Director
> shall issue a certificate accordingly.

35 U.S.C. § 256.  According to one court within this district,

> [t]his rule is meant to allow the correction of honest
> mistakes.  It is essentially an equitable rule which
> says that patents should not be invalidated for
> technical reasons which do not harm either the
> public or individual litigants, and where the moving
> party has obtained no fraudulent gain.

*U.S. Indus., Inc. v. Norton Co.*, 184 U.S.P.Q. 187, 189 (N.D.N.Y. 1974)

(Foley, J.) (citations omitted).  The error cited by Hubbell is thus plainly

correctable, and accordingly does not present a basis for finding patent

invalidity and denying plaintiff's motion for a preliminary injunction.

ii.   <u>Obviousness</u>

The principal thrust of defendant's invalidity argument is

obviousness – that the claims now in issue were obvious to one of

ordinary skill in the art at the time of the invention, based in large part

upon consideration of the Heimann patent.  While that patent was listed on

the front page of the '110 patent as having been included within the

prosecution history, it was not applied as a basis for rejecting the '110

patent claims.  Defendant Hubbell has argued, somewhat convincingly,

that the Heimann patent discloses all or virtually all of the limitations of

16

claims twenty-five and twenty-nine within the '110 patent.

A patent claim is invalid if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a); *see also Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372-73 (Fed. Cir. 2005).  In considering the issue of obviousness, a factfinder must engage in an objective analysis, applying the factors set forth in *Graham v. John Deere Co.*, 38 U.S. 1, 86 S. Ct. 684 (1966), including (1) the scope and content of the prior art; (2) the differences between the prior art and the claimed invention; (3) the level of ordinary skill in the art; and (4) secondary considerations, such as commercial success, long felt but unmet need, failure of others, and unexpected results.  *Graham*, 383 U.S. at 17-18, 86 S. Ct. at 693-94; *see also KSR Int'l Co. v. Teleflex Inc.*, __ U.S. __, 127 S. Ct. 1727, 1734 (2007) ("While the sequence of [these elements] might be reordered in any particular case, the factors continue to define the inquiry that controls.").  Courts are encouraged to use an "expansive and flexible approach" to determine whether an invention would have been obvious to a person skilled in the art, guided by functionality and "common sense" rather than rigidity.  *KSR Int'l*, 127 S. Ct. at 1739; *Leapfrog Enter., Inc. v.*

17

*Fisher-Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007).  If a court

concludes the claimed subject matter is obvious under the *Graham*

analysis, the claim is invalid under section 103.  *Id.* at 1734.

In cases involving the combination of familiar elements in a patent in

accordance with known methods, the Supreme Court has emphasized

that an invention likely will be obvious when it simply elicits predictable

results.  *KSR Int'l*, 127 S. Ct. at 1739, 1740.  Similarly, where a technique

is used to improve a device and a person of ordinary skill in the art

recognizes that similar devices would be improved in the same way, the

technique is obvious unless it is beyond that person's skill.  *Id.* at 1740.  In

other words, "[i]f a person of ordinary skill can implement a predictable

variation, § 103 likely bars its patentability."  *Id.*

A patent comprised of multiple elements, however, "is not proved

obvious merely by demonstrating that each of its elements was,

independently, known in the prior art."  *Id.* at 1741; *see also Grain*

*Processing Corp. v. Am. Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir.

1988) ("In determining obviousness, the inquiry is not whether each

element existed in the prior art, but whether the prior art made obvious the

invention as whole for which patentability is claimed.") (citation and

quotations omitted).  Rather, when conducting an obviousness analysis

courts should "identify a reason that would have prompted a person of

ordinary skill in the relevant field to combine the elements in the way the

claimed new invention does." *KSR Int'l*, 127 S. Ct. at 1741.  This

necessarily may require an examination of interrelated teachings of

multiple patents, the effects of demands experienced by the designed

community or existing in the marketplace, and the background knowledge

of a person with ordinary skill in the art.  *Id.* at 1740-41.  For example, a

patent's subject matter may be considered obvious to a person of ordinary

skill in the art if a known problem in the field existed at the time of the

invention for which an obvious solution is presented by the patent's

claims.  *Id.* at 1741-42.  On the other hand, "[i]f the prior art teach away

from combining known elements in the manner claimed by the invention at

issue, discovering a successful way to combine them is less likely to be

obvious."  *In re Omeprazole Patent Litig.*, No. M-21-81, 2007 WL

1576153, at *123-25 (S.D.N.Y. May 31, 2007).  Neither the motivation nor

the purpose of the patentee controls whether the subject matter of a

patent claim is obvious; rather, the "objective reach" of the patent dictates

the analysis.  *Id.* at 1741-42.

Courts nonetheless are cautioned, when assessing obviousness, to

avoid combining elements of prior art through the bias of hindsight which

otherwise would not have been combined but for the creativity and insight

of the inventor.  *KLR Int'l*, 127 S. Ct. at 1742; *Graham*, 383 U.S. at 36, 86

S. Ct. at 703.  Common sense encourages courts to consider that a person of ordinary skill in the art will "'pursue known options" where there is "'a finite number of identified, predictable solutions'" given that an individual of ordinary skill is "'a person of ordinary creativity, not an automaton.'"  *In re Omeprazole Patent Litig.*, 2007 WL 1576153, at *125 (quoting *KLR Int'l*, 127 S. Ct at 1742); *see also Leapfrog Enter.*, 485 F.3d at 1161; *McNeil v. Perrigo Co.*, No. 05 Civ. 1321, 2007 WL 1624764, at *5 (S.D.N.Y. June 5, 2007).

Against this backdrop, I have reviewed the Heimann patent in conjunction with the '110 patent to assess the issue of obviousness as to the '110 patent.  The Heimann patent, issued in 1989, discloses a modular connector assembly for an electrical utility box.  The various drawings associated with the invention reveal an electrical device, such as a socket, with receptacles capable of receiving plugs.  The drawings also reflect the existence of one of more wire sheathes, capable of terminating wires, feeding into plugs which are then received into the back of a particular device.  The patent further discloses a clamping device designed to hold the wires in place as they enter the outlet junction box.

The major distinction drawn by P&S between the Heimann device and claims twenty-five and twenty-nine of the '110 patent concern where the electrical plug wires are terminated.  In the Heimann patent the

20

electrical wires are terminated outside of the junction box into which the particular electrical device is being installed – a configuration which, P&S asserts, both teaches away from the '110 patent, which calls for termination of the electrical source wires inside the box, and would not pass muster under any applicable governing code, thus rendering the Heimann patent commercially unviable.  Hubbell counters that extending the Heimann technology to terminate the wires inside of the box would have been obvious to a person of ordinary skill in the art at the time of the '110 invention.[9]

Having reviewed the Heimann patent and considered it in the context of a person in ordinary skill in the art, I find the existence of serious questions regarding obviousness of the '110 patent, and in particular claims twenty-five and twenty-nine thereof.  Accordingly, when considering the remaining factors in the preliminary injunction calculus, I do so in the context of my finding that P&S has not demonstrated the requisite likelihood of success on the merits of its claims.[10]

_____

[9]      For purposes of the present motion I have accepted P&S's proposed definition of a person of ordinary skill in the art as being a person with a bachelor's degree in mechanical or electrical engineering, and with three years of relevant work experience in the electrical connector industry.

[10]      In light of my finding of the existence of serious questions regarding the validity of the '110 patent on the basis of obviousness, I have not addressed Hubbell's remaining invalidity arguments, and in particular its allegations of indefiniteness surrounding the '110 patent claims.

21

3.    Irreparable Harm

The granting of a preliminary injunction is a drastic remedy.  *See Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990).  The powerfully anti-competitive repercussions which such a provisional remedy can bring about in a patent infringement litigation setting is aptly illustrated in this case, in which P&S seeks to invoke the court's power, prior to a determination on the merits, to preclude a potential direct competitor from entering a market which is in its formative stages, thereby permitting P&S to solidify its already dominant position in the quick connector field.

Regardless of the nature of the claim being asserted, in order to qualify for such extraordinary equitable relief, a plaintiff must establish that absent the entry of a preliminary injunction it will suffer irreparable harm – that is, an injury for which no remedy at law, including an award of damages, is adequate to compensate.  *See Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) ("Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.") (citation and quotations omitted).

This traditional standard applies with equal force in the context of patent infringement.  *See Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d

22

1568, 1578-79 (Fed. Cir. 1996); *Nutrition 21 v. United States*, 930 F.2d 867, 871-72 (Fed. Cir. 1991); *see also eBay Inc. v. MercExchange, L.L.C.*, __ U.S. __, 126 S. Ct. 1837, 1839 (2006) (applying conventional principles of equity to application for a permanent injunction in a patent case).  In a case of this nature, however, the law presumes the existence of such irreparable injury when a strong showing of likelihood of success on the merits has been made.  *See Pfizer, Inc. v. Teba Pharm., USA, Inc.*, 429 F.3d 1364, 1381 (Fed. Cir. 2005).  Because I have found the existence of serious questions regarding plaintiff's likelihood of success on the merits, including those surrounding defendant's claim of invalidity on the basis of obviousness, I have not invoked this presumption, but instead have analyzed the existence of irreparable harm resorting to a traditional analysis.

P&S asserts that because of the unique circumstances presented, an award of damages, in the event of a finding of infringement, would be insufficient as compensation for the harm suffered due to Hubbell's continued infringement.  Many of the arguments raised in that regard, however, are typical of those which could be advanced in any infringement action.  Plaintiff argues, for example, that the denial of a preliminary injunction would be the functional equivalent of a forced license to a direct competitor, in contravention of its established practice not to open its

23

portfolio and grant licences under the '110 patent.  Plaintiff also argues

that the entry of Hubbell into the market will cause P&S to lose market

share and negate the advantage of both its innovation and its extensive

efforts to promote its quick-connect product, additionally maintaining that

this effect will further result in the reduction of sales of other P&S

products.

None of these arguments is particularly persuasive.  As Hubbell

convincingly argues, the potential loss of sales is not the type of harm

considered by the Federal Circuit as "special circumstances" sufficient to

establish irreparable harm.  *Nutrition 21*, 930 F.2d at 871 ("[N]either the

difficulty of calculating losses in market share, nor speculation that such

losses might occur, amount to proof of special circumstances justifying the

extraordinary relief of injunction prior to trial."); *Reebok Int'l Ltd. v. J.*

*Baker, Inc.*, 32 F.3d 1552, 1558 (Fed. Cir. 1994) (rejecting the argument

that potential lost sales alone could demonstrate irreparable harm

"because acceptance of that position would require a finding of irreparable

harm to every patentee, regardless of the circumstances"); *Illinois Tool*

*Works*, 906 F.2d at 683; *accord Eli Lilly*, 82 F.3d at 1568 (rejecting

plaintiff's claim that lost profits will result in irreparable injury to its overall

research efforts, as lost profits could be easily calculated and the lost

opportunity to conduct research is insufficient to compel a finding of

irreparable harm given that any manufacturer with a research and development program could make such a claim).  While perhaps challenging to quantify, plaintiff's lost sales resulting from competition by Hubbell through infringement of the '110 patent would be compensable as an element of damages.  *See King Instruments Corp. v. Perego*, 65 F.3d 941, 948-49, 951 (Fed. Cir. 1995).

In support of its remaining arguments, including that sale of Hubbell devices will cause price erosion, loss of P&S's bargaining power in the market, as well as a reduction in staff and loss of research and development, plaintiff relies primarily on cases in which the party requesting the injunction has demonstrated likelihood of success on the merits, thereby implicating a presumption of irreparable harm.  *See, e.g., Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001) (determining that plaintiff demonstrated likelihood of success on the merits and finding that defendant failed to rebut the resulting presumption of harm with its contentions that plaintiff's expert testimony on price erosion was speculative); *cf. Collagenex Pharm., Inc. v. Ivax Corp.*, 375 F. Supp. 2d 120, 130-32 (E.D.N.Y. 2005) (rejecting plaintiffs' reliance on case law finding a presumption of irreparable harm, where plaintiffs themselves were not afforded that same presumption).  *Purdue* is readily distinguishable from the circumstances now presented,

in light of my finding that serious questions remain regarding the validity of the '110 patent, thereby precluding P&S from reaping the benefit of the presumption of irreparable harm and the corresponding case law. *See Collagenex Pharm.*, 375 F. Supp. 2d at 130-32 (noting that where plaintiffs do not have the presumption of irreparable harm in their favor, the isolated factors relied upon to prove irreparable harm, including price erosion and loss of research and development, are "not persuasive"). The remaining cases relied upon by P&S are also distinguishable in that unique circumstances, not present in the matter at hand, resulted in a finding of irreparable harm in favor of the moving party. *See, e.g., Hybritech*, 849 F.2d at 1456 (affirming injunction where district court found irreparable harm based on nine case-specific factors, including a finding that the technology would bypass the patent by the conclusion of the litigation); *Canon Inc.*, 450 F. Supp. 2d at 255 (granting preliminary injunction, reasoning that money damages would be an inadequate remedy because the nature and location of defendant's business would make it highly difficult to locate and attach assets in order to satisfy a money judgment).

Based upon the foregoing I find that plaintiff has failed to establish the likelihood of irreparable harm, of a nature and to the degree required for the issuance of the extraordinary remedy of a preliminary injunction under applicable Federal Circuit authority.

26

### 4.    Balance of Hardships

In support of its quest for an injunction, P&S contends that if Hubbell is permitted to enter the market with its infringing quick-connect device, plaintiff's marketing efforts and patent protected monopoly position will be diluted.  As a counterweight to this argument, Hubbell asserts that if it is not permitted the enter the freshly cultivated quick-connect market, P&S's position will be further entrenched, with the benefit of the protection afforded by injunctive relief, thereby making it more difficult later to penetrate the market and effectively compete.[11]

Both parties have effectively asserted hardship depending upon the outcome of this motion.  At best, the factor is neutral, although in the end it probably weighs more heavily in favor of Hubbell, whose entry into the blossoming quick-connect market would be neutralized by a preliminary injunction, rather than P&S, which has already secured a competitive edge by virtue of its early entry into the field.

### 5.    Public Interest

To be sure, there is an interest served in promoting innovation by protecting the monopoly conferred by statute, and indeed under the United

---

[11]    As the Federal Circuit has noted, "[t]he hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating." *Illinois Tool Works*, 906 F.2d at 683; *see also Giantceutical, Inc. v. Ken Mable, Inc.*, 356 F. Supp. 2d 374, 381-82 (S.D.N.Y. 2005) (quoting *Illinois Tool Works*).

States Constitution, to inventors under the patent laws.  *See Festo Corp.*

*v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 730-31,

122 S. Ct. 1831, 1837 (2002).  The public's interest in promoting

innovation undeniably serves as the underpinning for the United States

patent system.  A patent, however, carries with it an inherently anti-

competitive aspect, one which would be furthered in this instance by the

issuance of a preliminary injunction.  *See Figueroa v. United States*, 466

F.3d 1023, 1034 n.16 (Fed. Cir. 2006) ("From their inception, the federal

patent laws have embodied a careful balance between the need to

promote innovation and the recognition that imitation and refinement

through imitation are both necessary to the invention itself and the very

lifeblood of a competitive economy.") (quoting *Bonito Boats, Inc. v.*

*Thunder Craft Boats, Inc.*, 489 U.S. 141, 146, 109 S. Ct. 971, 975 (1989)).

Accordingly, the public's interest is not in the end best served by

"removing what may well be a non-infringing product from the market."

*Telular Corp. v. Versus Tech., Inc.,* No. 93 C 7568, 1995 WL 38966, at *4

(N.D. Ill. Jan. 30, 1995); *see also Cummins-Allison Corp. v. Glory Ltd.,* No.

CIV. A C7008, 2003 WL 22125212, at *21 (N.D. Ill. Sept. 5, 2003).

With its injunction motion, P&S seeks to further that anti-competitive

edge and enhance its monopoly power in the market.  In this instance,

based upon P&S's own submissions, it appears that there would be

28

lingering effects of the anti-competitive nature of such an injunction.  As P&S has noted, among the primary users of the quick-connect materials are hospitals and educational institutions.  As P&S also notes, particularly in the hospital setting, acquisition of replacement parts is often necessary. Yet, any such institution constructed at a time when Hubbell was precluded from selling its product, should an injunction be granted, and plaintiff's PLUG-TAIL was thus the only available quick connect product, would be required to secure any future replacement parts from P&S in order to be compatible with the wiring and plug connector already installed into the junction box.  In short, any delay in Hubbell entering into the marketplace would have lasting ripple effects and would further, unfairly, promote P&S's market position.

In sum, considering and weighing all four factors relevant to the preliminary injunction analysis, I recommend a finding that while plaintiff's proof of infringement is strong, there exist serious questions regarding the invalidity of the '110 patent claims in issue in this case, and plaintiff has presented insufficient evidence of irreparable harm.  And, finding nothing that would tip the balance of hardships or the interest of the public sharply in favor of P&S, I therefore recommend denial of P&S's motion for preliminary injunction.

      B.    <u>Stay</u>

A court in which an action is pending retains the inherent authority to stay litigation under appropriate circumstances. *See Landis v. North Am. Co.*, 299 U.S. 248, 254-55, 57 S. Ct. 163, 166 (1936); *see also Abraham Natural Foods Corp. v. Mount Vernon Fire Ins. Co.*, No. 05-CV-4824, 2007 WL 1592977, at *2 n.7 (E.D.N.Y. June 1, 2007) (citing *Landis*). Hubbell now asks this court to invoke that authority and defer any rulings on the merits of plaintiff's infringement claims and its defenses, pending reexamination by the PTO of the patent in suit.

When considering whether to stay patent infringement litigation pending a reexamination of the patent in suit, courts generally examine three factors, including "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp. v. 3 Com Corp.*, 69 F. Supp. 2d 404, 406-07 (W.D.N.Y. 1999). A stay of litigation may be appropriate, pending PTO reexamination, even in a case where a preliminary injunction motion has been made, as is true in this case. *See Perricone v. Unimed Nutritional Servs., Inc.*, No. 301CV512, 2002 WL 31075868, at *3 (D. Conn. July 18, 2002) (granting stay despite plaintiff's pending motion for preliminary injunction where harm alleged by plaintiff, including loss of customers and sales as well as

30

erosion of market position, did not amount to undue prejudice).

In this instance, Hubbell's motion does not appear to have been interposed for tactical reasons; nor would P&S be unduly prejudiced in terms of its litigation positions, should a stay be granted.  As P&S tacitly acknowledges, Hubbell has not been dilatory in seeking reexamination of the '110 and '517 patents.  Indeed, the two reexamination applications were filed by Hubbell only shortly after issuance of the respective, disputed patents.  Moreover, this case is plainly in its infancy, the court not yet having conducted a Rule 16 conference or issued a case management scheduling order, thus presenting a very different situation than in many other circumstances where stays have been denied as having been sought too late in the litigation.[12]  *Contrast*, *e.g.*, *Xerox Corp.*, 69 F. Supp. 2d at 407 (denying stay where substantial discovery was conducted, dispositive motions were filed, and the action was nearly trial-ready); *Enprotech Corp. v. Autotech Corp.*, No. 88 C 4853, 1990 WL 37217 (N.D. Ill. Mar. 15, 1990) (denying stay where discovery was completed and case was set for trial); *Freeman v. Minnesota Mining & Mfg. Co.*, 661 F. Supp. 886, 888 (D. Del. 1987) (denying stay where discovery was completed and

---

[12]    Following a conference with the parties the court did excuse the discovery prohibition of Rule 26(d) of the Federal Rules of Civil Procedure and permitted limited discovery to go forward despite the fact that the parties have not yet conducted a Rule 26(f) discovery planning conference.

suit was filed two and a half years prior to motion for stay).

An important factor figuring into the stay equation is the desirability of drawing upon the expertise of the PTO regarding the complex areas of patentability implicated in this action.  It appears likely that proceedings before the PTO, even if reexamination is granted, would be of limited duration, and surely would consume less time and expense than this litigation, should it be permitted to go forward.  Accordingly, based upon my finding that the parties and the court could benefit immensely from the expertise of the PTO, and that its determination could potentially avoid the necessity of this case going forward, or at a minimum materially reshape the issues presented, I recommend that the stay be granted.[13]

      C.     <u>Motions *In Limine*</u>

           1.     <u>Plaintiff's Motion</u>

In its opposition to plaintiff's preliminary injunction motion, Hubbell has submitted a declaration of Joseph A. McGlynn, a registered patent attorney in private practice since 1974, and a former patent examiner.  In his declaration, McGlynn makes several observations regarding the '110 patent and the comparison of its claims to the Heimann patent, voicing his belief "that the failure to apply the Heimann patent in a rejection of the [the

---

      [13]     In the event, however, that the PTO should deny Hubbell's request for reexamination of the '110 and '517 patents, I recommend that the stay be lifted and this case be permitted to proceed.

'110 patent claims] was a clear error." McGlynn Aff. (Dkt. No. 24-2) ¶ 7. P&S asserts that McGlynn's affidavit improperly encroaches upon the court's prerogative, and is thus impermissibly offered as expert testimony.

Upon a motion for a preliminary injunction a court must be guided by the evidentiary principles which would apply at trial and govern the admissibility of evidence, including in the form of expert testimony. *See Suisman, Shapiro, Wool, Brennan, Gray, & Greenberg, P.C. v. Suisman*, No. 04-CV-745, 2006 WL 387289, at *3 n.2 (D. Conn. Feb. 15, 2006) (recognizing that in ruling on preliminary injunction motion, court applied Federal Rules of Evidence to determine admissibility of testimony); *see also* Fed. R. Civ. P. 65(a). The Federal Rules of Evidence permit receipt of expert testimony at trial under certain prescribed circumstances, providing that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; *see generally Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S. Ct. 1167 (1999); *Daubert v. Merrell Dow Pharm., Inc.,*

509 U.S. 579, 113 S. Ct. 2756 (1993).  While at common law expert

testimony addressing an "ultimate issue" was not permitted, that dictate

has been abrogated by Rule 704(a), which provides that "testimony in the

form of an opinion or inference otherwise admissible is not objectionable

because it embraces an ultimate issue to be decided by the trier of fact."

Fed. R. Evid. 704(a).

Applying Rule 704(a), the general consensus among the various

courts is that expert testimony which embraces a legal conclusion should

be excluded.  *See Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992).

Citing an Advisory Committee note explaining elimination of the distinction

between admissible and excludable expert opinion testimony, one court

has noted that

> [u]nder Rules 701 and 702, opinions must be
> helpful to the trier of fact, and Rule 403 provides for
> exclusion of evidence which wastes time. These
> provisions afford ample assurances *against the
> admission of opinions which would merely tell the
> jury what result to reach,* somewhat in manner of
> the oath-helpers of an earlier day. They also stand
> ready to exclude opinions phrased in terms of
> inadequately explored legal criteria. Thus the
> question, "Did T have capacity to make a will?"
> would be excluded, while the question, "Did T have
> sufficient mental capacity to know the nature and
> extent of his property and the natural objects of his
> bounty and to formulate a rational scheme of
> distribution?" would be allowed.

*Hygh*, 961 F.2d at 363-64 (quoting Fed. R. Evid. 704 Advisory Committee

Note and adding emphasis).

Upon application of these principles, it is clear that McGlynn's affidavit contains at least some argument which crosses the line and unduly attempts to influence the court's outcome on matters involving ultimate legal conclusions to be drawn.  Other portions of the affidavit, however, appear potentially to be helpful to the trier of fact, and thus are permissibly offered.  *See Bausch & Lomb, Inc. v. Alcon Laboratories, Inc.,* 79 F. Supp. 2d 252, 254-55 (W.D.N.Y. 2000).  While ultimately the extent, if any, of expert testimony to be permitted from Mr. McGlynn will be a determination for the trial court, I have treated portions of his affidavit which appear to be more in the nature of a legal conclusion as a memorandum, with no particular evidentiary value.  In light of McGlynn's PTO background, however, I have considered his opinions in order to assist me in interpreting claims twenty-five and twenty-nine of the '110 patent and assessing whether Hubbell has raised a serious question regarding their validity.  *See Amsted Indus., Inc. v. National Castings, Inc.,* No. 88 C 924, 1990 WL 106548, at *27-28 (N.D. Ill. July 11, 1990) (acknowledging that when patent claims are disputed, the parties are permitted to present expert testimony on how a person skilled in the art would interpret the claims); *cf. United States v. Stewart,* 433 F.3d 273, 311 (2d Cir. 2006) ("Clearly, an opinion that purports to explain the law to the

jury trespasses on the trial judge's exclusive territory."); *United States v. Scop,* 846 F.2d 135, 139-40 (2d Cir. 1988), *rev'd in part on reh'g on other grounds*, 856 F.2d 5 (2d Cir. 1988) (indicating that Federal Rule of Evidence 704 "was not intended to allow experts to offer opinions embodying legal conclusions").

### 2.    Defendant's Motion

In its submissions to the court, defendant has also sought a ruling *in limine*, urging exclusion from consideration of plaintiff's Exhibit C to its amended complaint, purporting to be "[a] true and correct copy of an advanced advertisement for the Snap Connect Devices" advertised by Hubbell.  Amended Complaint (Dkt. No. 9) ¶ 11 Exh. C.  Hubbell maintains that the exhibit was not properly authenticated, and that it was deprived of an opportunity to respond to it by virtue of the fact that it was referenced only in plaintiff's reply memorandum.

As P&S properly notes, certain materials, including self-promoting advertising and press materials, are treated under the Federal Rules of Evidence as self-authenticating.  *Woolsey v. Nat'l Transp. Safety Bd.,* 993 F.2d 516, 520-21 (5th Cir. 1993) (finding that self-promoting statements issued through press kits are self-authenticating under Federal Rules of Evidence 902); *see also Milton H. Greene Archives v. BPI Comnc'ns,* 378 F. Supp. 2d 1189, 1195 n.3 (C.D. Cal. 2005) (finding such documents to

be self-authenticating trade materials under Federal Rule of Evidence 902(7)).  Interestingly, now that oral argument has been heard, Hubbell has presented nothing to cast doubt upon the validity or authenticity of the disputed exhibit as reflecting efforts by Hubbell to market its quick-connect devices.  The court therefore finds no reason to strike the document or to exclude it from consideration in connection with the pending cross-motions.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

While plaintiff has plainly established that defendant Hubbell, a direct competitor, is poised to enter the electrical quick-connect market and compete with plaintiff's various embodiments of its '110 and '517 patents, and thus has established a strong case of infringement, significant questions exist regarding the validity of those patents, both of which may ultimately be reexamined by the PTO, at Hubbell's request.  In light of these questions, and my finding that in the event injunctive relief is denied P&S will not suffer a significant injury that cannot be compensated through remedies available at law, and finding no basis to conclude that either the balance of hardships or consideration of the public interest tips the scale markedly in plaintiff's favor, I recommend that plaintiff's motion for preliminary injunction be denied.  Additionally, based upon the prospect of reexamination in the near future by the PTO and out of a desire to have

the benefit of the PTO's expertise on the thorny questions surrounding defendant's claims of patent invalidity, I recommend the issuance of a stay of this litigation pending completion of that reexamination process.  Finally, I deny both parties' motions *in limine,* without prejudice to reapplication to the trial court for exclusion of the challenged evidentiary materials at trial.

Based upon the foregoing it is hereby

RECOMMENDED that plaintiff's motion for a preliminary injunction (Dkt. No. 6) be DENIED; and it is further

RECOMMENDED, that defendant's cross-motion to stay litigation pending completion of a reexamination proceeding by the PTO (Dkt. Nos. 24-27) be GRANTED, and it is further

ORDERED that the cross-motions of both parties for rulings *in limine* (Dkt. Nos. 28, 31) be DENIED, without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within ten (10) days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e) and 72; *Roland v. Racette*, 984 F.2d 85 (2d Cir. 1993);

IT IS FURTHER ORDERED, that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties in accordance with

this court's local rules.

Dated:      July 2, 2007
            Syracuse, NY


_____
David E. Peebles
U.S. Magistrate Judge